[Cite as *State v. Goe*, 2025-Ohio-4866.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | Case No. 2024CA00209 |
| Plaintiff - Appellee | Opinion and Judgment Entry |
| -vs- | Appeal from the Stark County Court of Common Pleas, Case No. 2024CR1510 |
| SEAN GOE | Judgment: Affirmed |
| Defendant – Appellant | Date of Judgment Entry: October 23, 2025 |

**BEFORE:** Craig R. Baldwin, William B. Hoffman, Robert G. Montgomery, Appellate Judges

**APPEARANCES:** Kyle L. Stone, Stark County Prosecuting Attorney, Lisa A. Nemes, Assistant Prosecuting Attorney, for Plaintiff-Appellee; D. Coleman Bond, for Defendant-Appellant

OPINION

*Hoffman, J.*

{¶1} Defendant-appellant Sean Goe appeals the judgment entered by the Stark County Common Pleas Court convicting him following jury trial of two counts of murder (R.C. 2903.02(A)(B)) with repeat violent offender specifications (R.C. 2941.149(A)), felonious assault (R.C. 2903.11(A)(1)) with a repeat violent offender specification (R.C. 2941.149(A)), tampering with evidence (R.C. 2921.12(A)(1)), and gross abuse of a corpse (R.C. 2927.01(B)), and sentencing him to an aggregate term of twenty-nine years to life in prison. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2} In June of 2024, the victim was twenty-four years old. Appellant was her boyfriend, and the pair had been living together for about two years in a relationship friends and family described as volatile.

{¶3} On June 29, 2024, the victim worked a shift at Hardee's restaurant. After leaving work, Stacy, a coworker of the victim, texted the victim, asking about the victim's plans for the night. The victim responded she was "going to get bopped," which she explained to Stacy meant she was going to get drunk. Tr. (I) 176-77.

{¶4} Later that evening, the victim and Appellant hung out with their neighbors, David and Kara, in the back yard of their apartment building. After going inside for the night, David realized he had misplaced his keys. Around 11:00 p.m., he and Kara knocked on the door of the victim's apartment. The victim answered the door and gave them the keys. Although he did not see Appellant, David heard Appellant's voice inside the apartment.

**{¶5}** On July 1, 2024, Appellant knocked on Kara's door in the afternoon or early evening. He was sweaty, and both Kara and David noticed he did not seem like himself. Appellant asked for snacks and a drink. Appellant was wearing a white Nike shirt.

**{¶6}** When Stacy arrived for work on July 1, her boss, Adam, asked when she had last spoken to the victim. Adam told Stacy the victim did not show up for work on June 30, and did not call to report she would not be coming in, which was unusual for the victim. Stacy had texted the victim on June 30, and received no response, and she became concerned about the victim's wellbeing after she heard the victim did not come to work. Around 2:30 p.m., Stacy drove to the victim's apartment. She did not see the victim's car in the parking lot.

**{¶7}** On July 1, Appellant went to the home of an acquaintance named Justice. Justice's mother had a Ring camera, which showed Appellant was driving the victim's vehicle. Appellant met Justice and another person at McDonald's to purchase marijuana using a cash app around 8:00 p.m. Video footage from McDonald's showed Appellant was driving the victim's vehicle.

**{¶8}** The victim's mother contacted the Stark County Sheriff's Department on July 2 because she had not heard from the victim for several days. Deputy Richard Gurlea and Deputy Cheyenne Urbach went to the victim's apartment to investigate. The deputies knocked on the apartment door and received no response. They found the door was unlocked and entered the apartment. The apartment was unkempt with clothes piled everywhere and food and unwashed dishes laying around. Deputy Urbach noted a terrible odor, as if something had died in the apartment. Clothing was piled behind the door, and there was a trash bag in the bedroom with a pillow on top of it. The television on the

bedroom wall was shattered and there were holes in the walls. The window was cracked open and covered with a blanket.

**{¶9}** While Deputy Gurlea remained behind finishing paperwork, Deputy Urbach left the scene. Shortly after leaving the apartment, she saw Appellant driving the victim's vehicle in the area. The deputy regularly patrolled this area, and was familiar with the victim and with Appellant. She knew Appellant did not have a driver's license and usually traveled by bicycle or walked. Deputy Urbach initiated a traffic stop of the vehicle.

**{¶10}** Deputy Urbach patted Appellant down and explained the reason for the stop. She asked Appellant where his girlfriend was, and he responded he had not seen her. The deputy told Appellant the victim was missing, and Appellant responded, "Well, she drinks[.]" Tr. (1) 229. Appellant then fled on foot. During an inventory search of the vehicle, Deputy Urbach saw a shovel covered with blankets in the back seat. She paused the inventory search to obtain a warrant for the vehicle.

**{¶11}** Meanwhile, officers obtained a search warrant for the apartment. Sergeant Derek Little participated in the search. He noted the apartment was very dirty and chaotic. He detected a distinct odor of decomposition, which he associated with the smell of a dead body. In the bedroom he noted a blood stain on the bed, and cleaning supplies in the bedroom, with droplets of blood on the wall. Inside a garbage bag he found blood-soaked paper towels and rubber gloves. After pulling the bed out from the wall, officers found blood on the carpet. Using a chemical agent called BLUESTAR, officers found an area on the floor where blood had been cleaned up and was no longer visible to the naked eye. Officers found a bucket and a sponge in the bathroom. BLUESTAR confirmed the presence of blood on the bucket and the sink.

{¶12} Officers then conducted a search of the victim's vehicle. They found a blue I-phone tucked between the center console and the driver's seat, and found the victim's wallet in the passenger area. In addition to the dirty shovel, the backseat contained a guitar, blankets, clothing, and the spare tire. The cargo area of the vehicle was empty except for a pen. An imprint on the carpet of the cargo area led officers to believe something was recently moved from the area. BLUESTAR confirmed the presence of blood in the cargo area.

{¶13} Officers placed an emergency request with cell phone service to "ping" the victim's phone and Appellant's phone to locate the victim. They received the records the evening of July 2. The victim's phone had been active, but Appellant's phone was not active.

{¶14} On July 3, Appellant appeared at the Refuge of Hope, a homeless shelter for men. Appellant asked for assistance to obtain a bus ticket to Zanesville, claiming he was going to reunite with his mother. Appellant gave the shelter his actual first name, but a fictitious last name. An employee recognized Appellant as a person of interest in the victim's disappearance, and called the police. Appellant was taken into custody.

{¶15} Meanwhile, employees of the City of Canton Parks Department emptied the trash in the Mother Goose Land park, and found a body in a trash can. The body was wrapped in a fitted sheet. The face of the body was battered beyond recognition, but the victim was identified from tattoos on her body. A fender and a bloody vehicle mat from the victim's vehicle were also found in the trash. The Cuyahoga County Coroner's Office performed an autopsy on the victim, and determined she died of blunt force trauma to the

head and neck.  The victim sustained at least ten injuries to her head, as well as less severe injuries to her torso and extremities.

{¶16} Using cell phone records and video from Canton traffic cameras, officers reconstructed Appellant's movements while he was driving the victim's vehicle on July 2, 2024.  At 10:10 a.m., city traffic cameras captured Appellant driving the vehicle southbound on Stadium Park Drive, entering Stadium Park.  He remained in the park for two hours.  When he left the park, a camera captured him heading northbound past the Marion Motley statute at 12:09 p.m.  At 12:40 p.m., Appellant left a BP gas station.  An employee at the station knew Appellant and the victim, as they regularly frequented the station.  The employee noted on July 2, Appellant was alone, and was wearing the victim's pink sunglasses.  Appellant was in the vicinity of Mother Goose Land from around 1:04 p.m. until 1:20 p.m.

{¶17} At the apartment building, David noted he had not seen Appellant or the victim coming and going from the apartment in several days, and there were no lights on in the apartment.  David and Kara noticed blankets covering the windows, while normally they could see directly into the apartment.  David also found it unusual the victim's vehicle did not move from the parking lot for several days.  David and Kara were concerned about the victim's cats in the apartment.   On July 4, 2024, the landlord gave David permission to break out a back window in the apartment, which was already cracked, to tend to the cats.

{¶18} David entered the apartment and noticed the apartment was filthy and the bedroom was trashed.  While attempting to catch a cat, David moved a pile of clothes and found the white Nike shirt he saw Appellant wearing a few days earlier.  The shirt had

blood on it, which was later confirmed to be the victim's blood. The shirt did not have blood on it when David saw Appellant previously wearing the shirt. David called the Sheriff's Department. Upon returning to the apartment to collect the shirt, Sergeant Bryan Johnson noted the handle of a hammer sticking out of a bag located to the left of the apartment, and took the hammer into evidence as a potential murder weapon given the condition of the victim's body.

{¶19} Appellant was indicted by the Stark County Grand Jury with two counts of murder with repeat violent offender specifications, felonious assault with a repeat violent offender specification, burglary, tampering with evidence, grand theft, and gross abuse of a corpse. The case proceeded to jury trial in the Stark County Common Pleas Court, with the repeat violent offender specifications tried to the court. The jury found Appellant guilty of both counts of murder, felonious assault, tampering with evidence, and gross abuse of a corpse. The jury found Appellant not guilty of burglary and grand theft. The court convicted Appellant in accordance with the jury's verdict, and convicted Appellant of the repeat violent offender specifications. The trial court merged the second count of murder along with its specification into the first count of murder, and merged the felonious assault conviction and its specification into the first count of murder. The trial court sentenced Appellant to a term of incarceration of fifteen years to life for murder, and ten years of incarceration for the repeat violent offender specification, to be served consecutively. The trial court sentenced Appellant to thirty-six months of incarceration for tampering with evidence and twelve months incarceration for gross abuse of a corpse, to be served consecutively with each other and with the murder sentence, for an aggregate term of incarceration of twenty-nine years to life.

**{¶20}** It is from the December 11, 2024 judgment of the trial court Appellant prosecutes his appeal, assigning as error:


I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT, AND THE CONVICTION MUST BE REVERSED.

II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED.

III. THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION IN LIMINE REGARDING THE ADMISSIBILITY OF CELL PHONE RECORDS, AND BY ALLOWING DETECTIVE JOHNSON TO TESTIFY AS AN EXPERT ABOUT R.S.'S CELL PHONE LOCATION DATA.


I.

**{¶21}** In his first assignment of error, Appellant argues the State did not present sufficient evidence to support his convictions because they did not present sufficient identification to identify him as the person who murdered the victim and disposed of her body in the Mother Goose Land trash can. We disagree.

**{¶22}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

{¶23} Appellant does not challenge the sufficiency of the State's evidence to prove any specific element of the crimes of which he was convicted. Rather, he argues the State did not present sufficient evidence to identify him as the perpetrator. He specifically argues police focused solely on him as a suspect. He argues police failed to submit cleaning products found at the scene of the murder for DNA testing, which could have exonerated him. He also argues police failed to investigate his neighbor David, who was in the apartment rescuing the cats and could have planted the blood-stained shirt he claimed Appellant was wearing earlier, as well as the hammer later found by police. Appellant's criticisms of the investigation are not relevant to the question of whether the State presented sufficient evidence from which a rational trier of fact could have found he was the perpetrator of the murder.

{¶24} Appellant also argues the timeline of events established he could not have put the victim's body in the trash can at Mother Goose Land. He argues the testimony of the park workers established they emptied the trash between 1:30 p.m. and 2:00 p.m. on July 2, while records demonstrated he was in the area of Mother Goose Land from 1:04 p.m. to 1:20 p.m. He argues he could not have put the victim's body in the trash can on July 2, because he was not in the area after the trash was collected, and if he had placed the body in the trash on July 2, the employees would have found the victim's body that day rather than the next day.

{¶25} Appellant mischaracterizes the testimony regarding the time the trash was emptied on July 2. While one park employee testified on cross-examination he believed

as a "ballpark" time they emptied the trash on July 2, between 1:30 and 2:00, the other employee testified the time frame was likely between 12:45 and 2:30 p.m. The employees did not know the exact time they emptied the trash in Mother Goose Land, and only definitely remembered it was sometime after lunch. Therefore, we find the trash could have been emptied before Appellant was in the proximity of Mother Goose Land, allowing him to put the body in the trash between 1:04 and 1:20 when phone records placed him in the area.

{¶26} The State presented evidence no one saw the victim or heard from the victim after the evening hours of June 29, 2024. On July 1, Appellant appeared at Kara's apartment wearing a white Nike shirt, sweating, and not acting like himself. Although he did not have a driver's license and was known to travel by bicycle or on foot, Appellant took the victim's vehicle to purchase marijuana, and was captured on camera driving the victim's vehicle.

{¶27} Cell phone records and video from cameras around the city establish a time frame placing Appellant driving the victim's vehicle on July 2, in the area of Mother Goose Land where the body was found the next day. Appellant was stopped while driving the vehicle on July 2, and the vehicle was searched. The evidence from the vehicle demonstrated numerous items, including the spare tire, were in the backseat of the vehicle, while the cargo hold was empty. The cargo hold tested positive for the victim's blood, as did the mat from her vehicle found with her body. The victim's blood was also found on the Nike shirt the neighbor, David, saw Appellant wearing on July 1. At the time David saw Appellant wearing the shirt, there was no blood on the shirt. Appellant's DNA was found on the bucket and gloves found in the apartment. It appeared to police the

victim was killed was in the bedroom of the apartment she shared with Appellant, and the room showed signs of an attempt to clean up blood.

{¶28} When Appellant was stopped by Deputy Urbach, he fled upon being questioned about the whereabouts of his missing girlfriend. When he appeared at the homeless shelter looking for money for a bus ticket, he gave a fictitious name.

{¶29} Although the evidence was circumstantial, we find the State presented sufficient evidence from which a rational trier of fact could find he was the perpetrator of the murder of the victim and the disposal of her body. The first assignment of error is overruled.

II.

{¶30} In his second assignment of error, Appellant argues the judgment convicting him of murder is against the manifest weight of the evidence for the same reasons set forth in his first assignment of error. We disagree.

{¶31} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 1997-Ohio-52, *quoting State v. Martin*, 20 Ohio App. 3d 172, 175 (1st Dist. 1983).

{¶32} Appellant argues police did not submit the cleaning bottles for DNA testing which could have exonerated him. He argues police did not investigate the neighbor, David, who found the bloody Nike shirt after police had searched the apartment, and was

in the apartment prior to police finding the hammer which may have been the murder weapon. He argues he could not have dumped the body in the trash between 1:04 and 1:20 p.m. on July 2, if the trash was not emptied until 1:30 to 2:00.

{¶33} Appellant was able to cross-examine police regarding their failure to submit the cleaning bottles for DNA testing. On redirect examination, Deputy Derek Little testified they did not collect the bottles because anyone who lives in the apartment would leave DNA on the bottles. While Appellant argues the same reasoning should have applied to the bucket and the gloves collected and tested, we find the failure of police to submit all of the cleaning supplies for DNA testing does not render the judgment against the manifest weight of the evidence.

{¶34} David, the neighbor who later entered the apartment to rescue the cats, testified at trial and was subject to cross-examination. Both police and neighbors who entered the apartment testified the apartment was messy, with clothes piled everywhere. The fact David found the Nike shirt where police had missed it on an earlier search does not necessarily mean David "planted" the shirt and lied about seeing Appellant wear it. Police were focused primarily on the crime scene in the bedroom, not the clothing strewn throughout the apartment. While police also did not pick up the hammer on their first search, and only noticed the hammer upon returning after David had entered the apartment, at the time police initially searched the apartment the body had not been found and they were unaware the victim had died from blunt force trauma.

{¶35} Finally, for the reasons stated above, we reject Appellant's argument the time frame the trash was emptied on July 2, affirmatively demonstrates he could not have put the victim's body in the trash because he was not in the area after 1:30-2:00. As

discussed previously, the time frame was described as a "ballpark," and one of the employees stated the time frame was between 12:45 and 2:30.

{¶36} Based on all of the evidence in the case as set forth in our statement of the facts and our discussion of Appellant's first assignment of error, we find the judgment is not against the manifest weight of the evidence.

{¶37} The second assignment of error is overruled.

III.

{¶38} In his third assignment of error, Appellant argues the trial court abused its discretion in overruling his motion in limine to exclude the testimony of Sergeant Johnson as an expert witness. We disagree.

{¶39} Appellant filed a motion in limine to exclude Sgt. Johnson's testimony on the basis he could not certify the cell phone records from T-Mobile. He also argued the officer could not testify as an expert regarding the creation of the map of the phone "pings" using the longitude and latitude data from the phone. The trial court found the officer's testimony was admissible lay testimony regarding the creation of the map, as he was simply plotting the coordinates on the map. The trial court found the cell phone records themselves admissible without authentication from someone from T-Mobile because the records had been certified.

{¶40} At trial, Appellant did not object to Sgt. Johnson's testimony on the grounds he was not qualified as an expert. Appellant did object to the admission of the physical exhibits of the cell phone records and related map.

{¶41} For the first time on appeal, Appellant argues Sgt. Johnson's testimony was not relevant at the time he testified because there was no evidence Appellant was in

possession of the victim's cell phone. Because Appellant did not object on this basis in the court below, we must find plain error in order to reverse. To establish plain error, Appellant must show an error occurred, the error was obvious, and there is a reasonable probability the error resulted in prejudice, meaning the error affected the outcome of the trial. *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, *citing State v. Rogers,* 2015-Ohio-2459, ¶ 22.

**{¶42}** The State later presented evidence Appellant was captured on video cameras throughout the city driving the victim's vehicle, and the cameras coordinated with the "pings" from the victim's phone as noted in the cell phone records. Had Appellant objected and the objection been sustained, the State simply could have presented this testimony prior to the testimony of Sgt. Johnson regarding the cell phone map. We find Appellant has not demonstrated plain error.

**{¶43}** Appellant argues the officer improperly testified as an expert regarding the accuracy of the cell phone records. Appellant did not object during the testimony of Sgt. Johnson on this basis, and again, we must find plain error in order to reverse.

**{¶44}** Appellant acknowledges in his brief an officer's testimony concerning cell phone records and the location of cellular towers used by a phone in relation to locations relevant to the crime constitutes lay opinion testimony, which does not require specialized knowledge, skill, experience, training, or education. *State v. Wells,* 2022-Ohio-30, ¶ 25 (2nd Dist.). However, Appellant argues Sgt. Johnson's testimony went beyond lay testimony because he testified as to different methodologies used in accumulating the data, as well as the accuracy of the information in the cell phone data. Appellant points to the following testimony which he claims constituted improper expert testimony:

A. Those are some of them, yes. I believe those are the cell detail records.

Q. Is that the same as the timing advance?

A. No, ma'am.

Q. What is the difference?

A. That timing advance will give you a more accurate location because it gives that distance from the tower.

**{¶45}** Tr. (3) 230.

**{¶46}** This testimony was elicited by defense counsel during cross-examination. The doctrine of invited error provides "a party is not permitted to take advantage of an error that he himself invited or induced the court to make." *State v. Sklenka,* 2015-Ohio-5104, ¶ 12 (5th Dist.). Even assuming arguendo the officer's testimony set forth above constituted expert testimony rather than lay testimony, having specifically questioned the officer about the timing advance, Appellant invited any error in the officer's testimony.

**{¶47}** The third assignment of error is overruled.  The judgment of the Stark County Common Pleas Court is affirmed.  Costs are assessed to Appellant

By: Hoffman, J.

Baldwin, P.J. and

Montgomery, J. concur